IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 16-cv-00297-RBJ

RACHEL BARRETT,

    Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security,

    Defendant.

## ORDER

This matter is before the Court on review of the Commissioner's decision denying claimant Rachel Marie Barrett's application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Jurisdiction is proper under 42 U.S.C. § 405(g). For the reasons explained below, the Court AFFIRMS the Commissioner's decision.

### I. STANDARD OF REVIEW

This appeal is based upon the administrative record and the parties' briefs. In reviewing a final decision by the Commissioner, the role of the District Court is to examine the record and determine whether it "contains substantial evidence to support the [Commissioner's] decision and whether the [Commissioner] applied the correct legal standards." *Rickets v. Apfel*, 16 F. Supp. 2d 1280, 1287 (D. Colo. 1998). A decision cannot be based on substantial evidence if it is "overwhelmed by other evidence in the record." *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir.

1988).  Substantial evidence requires "more than a scintilla, but less than a preponderance." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009).  Evidence is not substantial if it "constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).  Regarding the application of the law, "reversal may be appropriate when the [Social Security Administration] Commissioner either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards." *Springer v. Astrue*, No. 11-cv-02606, 2013 WL 491923, at *5 (D. Colo. Feb. 7, 2013) (internal citation omitted).

## II. BACKGROUND

Ms. Barrett was born on January 24, 1983.  R. 25.  She resides in Denver, Colorado.  R. 71.  She has a high school education, and her past employment includes work as a child daycare worker and daycare teacher.  R. 25.  However, since her amended, alleged disability onset date of February 22, 2011, Ms. Barrett has not held substantial gainful employment.  R. 12.

A. **Medical Background.**

Ms. Barrett's relevant medical history begins in February 2011.  On February 22, 2011 Ms. Barrett, who has a history of deep vein thrombosis ("DVT") in her right leg, sought treatment for lower right leg pain.  R. 323–27.  Although she had moderate tenderness and mild swelling in her upper and middle leg, her evaluation returned no evidence of DVT at that time. R. 324–25.  It did, however, reveal superficial venous thrombosis ("SVT") in "the greater saphenous vein and lesser saphenous vein."  R. 324.  Plaintiff would again seek treatment for an aching pain in her right leg on July 29, 2011.  R. 317–20.  The evaluation conducted during this visit once again came back mostly normal, aside from noting tenderness in Ms. Barrett's thigh

and right leg SVT. R. 318 (noting "[n]o erythema, swelling, laceration, abrasion or ecchymosis [in plaintiff's extremities and no] extremity edema").

Roughly one year after her the first evaluation described above, Ms. Barrett again sought treatment. This time, however, it was for right lower leg swelling and worsening chest pain on February 28, 2012. R. 304–15, 332–33, 468. Her evaluation during this visit noted that Ms. Barrett had "severe right calf pain," and that she had "extensive right leg deep venous thrombosis." R. 304, 332. Ms. Barrett was subsequently hospitalized until the next day, February 29, 2012, at which time she was transferred to Denver Health where she remained until March 2, 2012. R. 312, 468. Plaintiff's discharge diagnoses revealed acute pulmonary embolism, DVT, right leg pain, as well as "acute hypoxic respiratory failure[.]" R. 468. Dr. Katherine Anderson subsequently conducted a follow-up evaluation of Ms. Barrett on March 16, 2012, noting that Ms. Barrett had "[w]armth and heat and swelling over her right calf." R. 441–42. Her pulmonary exam, however, came back clear. R. 442.

According to the record, Ms. Barrett next received medical care on August 8, 2012. R. 297. During this visit, Ms. Barrett once again complained of pain and swelling in her right leg. *Id.* Her examination, however, revealed that she did not have any acute changes in her lower extremity, nor did she have any motor or sensory deficit. R. 298–99. It nonetheless revealed that plaintiff was obese with a body mass index ("BMI") of 37 at that time. R. 298. Ms. Barrett was subsequently sent home in "good condition." *Id.*

Ms. Barrett again saw Dr. Anderson again on December 14, 2012. R. 375. This time, Ms. Barrett reported aches and pains while "she is down on the floor for 30 minutes playing with her daughter" and that she had "increased swelling in her right lower extremity." *Id.* She

nevertheless reported "stay[ing] fairly active walking her child," and that she "gets out and about." *Id.*  Ms. Barrett also reported no chest pain during this visit. *Id.*  Dr. Anderson nevertheless noted that, based on her medical history, Ms. Barrett had "[r]ecurrent DVTs in [her] . . . right lower extremity with pain and swelling if [she] . . . does not elevate her legs frequently." R. 375.

From March 29, 2013 through April 1, 2013 Ms. Barrett was once again hospitalized, this time for upper GI bleeding. *See* R. 264.  She again saw Dr. Anderson before being discharged on April 2, 2013. R. 353.  At that time, Dr. Anderson revised Ms. Barrett's Temporary Assistance for Needy Families ("TANF") paperwork "to state [that claimant] . . . was unable to tolerate more than 20 hours [of work] per week" due to this recent hospitalization. *See* R. 353. Dr. Anderson also devised a plan to deal with Ms. Barrett's upper GI bleeding, stress, and other conditions. *Id.*

Dr. Anderson then saw plaintiff several months later on June 21, 2013. R. 502.  During this visit, Dr. Anderson noted that plaintiff had "a warm, tender area in her leg." *Id.*  Dr. Anderson recommended lidocaine for plaintiff's pain, also referring her to pool therapy for exercise. *Id.*  Her BMI at this time was reported to be 39.4. R. 503.  Later that same year on October 29, 2013 Ms. Barrett again sought medical attention, reporting nausea and abdominal cramping. R. 512.  Dr. Anderson's physical evaluation of plaintiff during this visit revealed that plaintiff's cardiovascular signs were normal, but that she had "[m]ild left upper quadrant tenderness to deep palpation." *Id*.  In an addendum to Dr. Anderson's clinical notes, she noted that Ms. Barrett's international normalized ratio ("INR")—a measurement related to blood

clotting—was "extremely elevated[,]" which meant that plaintiff's blood was very thin and that she should stop taking her anticoagulant medication. R. 513.

Around this same time plaintiff underwent a psychological examination with Debra Grote, Ph.D. R. 493–98. Dr. Grote noted that plaintiff had a low average intelligence, a learning disorder, and a depressive disorder with intermittent, but not current, depression. *Id.* Dr. Grote subsequently gave her opinion that plaintiff would "unlikely" be able to "obtain and regain gainful employment" due to "severity and chronicity of her medical problems and depression." R. 497.

Next, on March 4, 2014 claimant had another appointment with Dr. Anderson. R. 518. This time, Ms. Barrett reported ongoing sleep disturbances and fatigue during the day. *Id.* Among other things, Ms. Barrett also reported swelling and pain in her leg that felt much worse at night. *Id.* In Ms. Barrett's words, "I feel that I am falling apart." *Id.* Dr. Anderson's examination found that while Ms. Barrett appeared somewhat distressed and had "edema and hyperemic changes in her right calf tenderness" as well as "palpable veins that are most consistent with varicose veins in her right calf[,]" she had a normal cardiovascular exam and respiratory findings. *Id.*

Later that month on March 28, 2014 Ms. Barrett again sought medical attention, reporting "constant and severe pain in her right leg" as well as recent "shortness of breath with exertion." R. 521. She was subsequently referred to the emergency department for further evaluation. *Id.* However, a chest CT scan conducted later on at the emergency department revealed no evidence of pulmonary embolus, which had been one of Dr. Anderson's concerns in referring Ms. Barrett. *See* R. 520–21, 675. Shortly thereafter, claimant's symptoms appeared to resolve and Ms.

Barrett reported she was feeling better. R. 520. Upon discharging Ms. Barrett, Dr. Anderson ordered an echocardiogram for the following week as well as a home sleep study. *Id.*

On May 12, 2014 Ms. Barrett underwent a consultative examination with Dr. Richard Caron. R. 648–50. Plaintiff reported pain and swelling her legs, numbness in her toes, and shortness of breath with moderate exertion. R. 648. Dr. Carson nevertheless found that plaintiff had no difficulty moving or getting up from a seated or supine position, had no pitting swelling, had full range of motion in all joints, and, among other things, full motor strength. R. 649–50. He subsequently opined that plaintiff could occasionally operate food controls, as well as occasionally balance, stoop, kneel, or crawl, but could never climb or crouch, walk a block on rough or uneven surfaces, or work around unprotected heights, environmental irritants, extreme temperatures, or vibrations. R. 644–47. Finally, also in May of 2014 Ms. Barrett underwent a psychological evaluation with William Graham, Ph.D. R. 526–30. Dr. Graham noted that Ms. Barrett's mental status was mostly normal, although she had some mild mental limitations and a mild to moderate limitation in adaptive function and the ability to carry out complex instructions. R. 530–34.

B. **Procedural History.**

On January 15, 2013 Ms. Barrett filed an application for disability insurance benefits and supplemental security income, alleging disability resulting from her blood clots, DVT, edema, pulmonary embolism, and varicose veins beginning September 1, 2009. R. 10, 35–36, 83, 183–95. These claims were initially denied on May 24, 2013. R. 105–08. Claimant then requested a hearing, which was held on July 22, 2014 in Denver, Colorado before Administrative Law Judge ("ALJ") Jennifer A. Simmons. R. 32. The ALJ issued a decision denying Ms. Barrett benefits

on August 28, 2014. R. 7. Ms. Barrett subsequently appealed that decision to the Appeals Council, which denied her appeal on December 9, 2015. R. 5. Ms. Barrett timely filed an appeal in this Court on February 8, 2016. ECF No. 1.

### C. **The ALJ's Decision.**

The ALJ issued an unfavorable opinion after evaluating the evidence according to the Social Security Administration's standard five-step process. R. 10–27. First, the ALJ found that Ms. Barrett had not engaged in substantial gainful activity since her amended, alleged onset date of February 22, 2011 through her date last insured of December 31, 2014. R. 12. At step two, the ALJ found that Ms. Barrett had the following severe impairments: obesity, history of DVT and pulmonary emboli, varicose veins in her right calf, and a learning disorder. *Id.* At step three, the ALJ found that Ms. Barrett did not have an impairment or combination of impairments that met the severity of a condition listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 13.

The ALJ then found that Ms. Barrett retained the residual functional capacity ("RFC") to perform a range of sedentary work. R. 16. The ALJ also found that Ms. Barrett could "lift, carry, push, and/or pull ten pounds occasionally and less than 10 pounds frequently." *Id.* She could also "stand and/or walk for two hours in an eight-hour workday" but "[h]er ability to sit is unlimited with normal breaks." *Id.* Furthermore, the ALJ found that Ms. Barrett "can occasionally stoop, kneel, crouch, and crawl" and that she "can frequently balance." *Id.* While Ms. Barrett "cannot climb ladders, ropes, or scaffolds" or "perform work at hazardous heights[,]" the ALJ found that "she can occasionally climb stairs and ramps" and that she "can tolerate occasional exposure to extreme cold, extreme heat, or vibration" as well as "occasional exposure to dust, fumes, and environmental irritants." *Id.* The ALJ also found that Ms. Barrett "cannot

work around dangerous moving machinery" but that "[s]he can occasionally use her lower extremities for operation of food controls." *Id.* Finally, the ALJ noted that Ms. Barrett "is able to understand, remember, and carry out tasks learned up to and including three months[,]" but that "[s]he can rarely walk on uneven or rough surfaces" and her "job must allow her to elevate her lower extremities up to 18 inches." *Id.*

At step four, the ALJ concluded that Ms. Barrett was unable to perform any of his past relevant work. R. 25. Finally, at step five, the ALJ determined that the transferability of job skills was irrelevant because the Medical-Vocational Rules supported a finding that Ms. Barrett was "not disabled" regardless of job skill transferability. *Id.* Nevertheless, the ALJ found that there existed jobs in significant numbers in the national economy that Ms. Barrett, based on her age, education, work experience, and RFC, could perform. *Id.* Therefore, the ALJ concluded that Ms. Barrett was not under a disability from February 20, 2011 (her amended, alleged onset date) through August 28, 2014 (the date of the ALJ's decision). R. 26–27.

### III. ANALYSIS

Ms. Barrett makes three main arguments that the ALJ's decision is not supported by substantial evidence. Her arguments focus on the ALJ's RFC determination. First, she argues that in making that assessment, the ALJ did not properly evaluate the opinion of Dr. Richard Carson. ECF No. 15 at 7–8. Second, Ms. Barrett contends that the ALJ's restriction regarding her need to elevate her legs only 18 inches rather than above her heart was made in error. *Id.* at 8–9. Finally, she argues that the ALJ failed to comply with SSR 96-8p, which plaintiff contends requires the ALJ to perform "function-by-function" analysis when making an RFC

determination. *Id.* at 9–10. Finding that none of these arguments warrant a remand or reversal, I affirm the ALJ's decision. I discuss each issue in turn.

### A. The Opinion of Dr. Richard Carson.

Plaintiff first takes issue with how the ALJ evaluated Dr. Richard Carson's opinions regarding plaintiff's limitations. She argues that the ALJ committed reversible error when she rejected some of Dr. Carson's opinions for not being supported by objective medical evidence in the record. ECF No. 15 at 7–8. However, I find that the ALJ explained why she rejected portions of Dr. Carson's opinion, and that her reasons for doing so are supported by substantial evidence. Therefore, I conclude that no reversible error occurred.

In crafting an RFC, an ALJ is not required to base her assessment on any *specific* medical opinion in the record. 20 C.F.R. § 404.1527(e)(2) ("Administrative law judges are responsible for reviewing the evidence and making findings of fact and conclusions of law. They will consider opinions of State agency medical or psychological consultants, other program physicians and psychologists, and medical experts[.]"); *see also Howard v. Barnhart*, 379 F.3d 945, 949 (10th Cir. 2004) ("[T]he ALJ, not a physician, is charged with determining a claimant's RFC from the medical record.").

Nevertheless, an ALJ *is* required to consider medical opinions in the record and must assign these opinions weight by considering all six of the factors found at 20 C.F.R. § 404.1527(c). *See Rivera v. Colvin*, 629 F. App'x 842, 844 (10th Cir. 2015) ("An ALJ must consider six factors to determine what weight to give a medical opinion: (1) the examining relationship between the physician and the applicant; (2) the length, nature, and extent of their treatment relationship; (3) the strength of the evidence supporting the opinion; (4) the

consistency of the opinion with the record as a whole; (5) the physician's specialty; and (6) any other factors, such as the physician's familiarity with disability programs and the extent of his familiarity with other information in the record, that tend to support or contradict the opinion.") (citing 20 C.F.R. §§ 404.1527(c), 416.927(c)).

While an ALJ must consider these factors, she does not need to explicitly discuss them all. *See Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). Rather, so long as her decision is "sufficiently specific to make clear to any subsequent reviewers the weight [she] gave to the . . . medical opinion and the reasons for what weight[,]" she does not commit reversible error. *Id.* (internal quotation marks and citations omitted) (finding that an ALJ "satisfie[d] this requirement" where the ALJ stated that he gave "very little weight" to an opinion, cited evidence to contradict that assessment, and where the court found that the ALJ's reasoning was supported by medical evidence in the record).

Such is the case here. Although she did not explicitly discuss all six factors in assessing Dr. Carson's opinions, the ALJ made exceedingly clear which of Dr. Carson's decision she rejected and why. A few examples illustrate this point. For instance, the ALJ noted that she rejected Dr. Carson's assessment that plaintiff "can only sit for 30 minutes at one time, and stand or walk for 15 minutes at one time" because "[t]here is no support for such limitations in Dr. Carson's examination findings, as the claimant's gait was normal and she was not noted to be uncomfortable while sitting." R. 22. She also explained that she rejected Dr. Carson's finding that plaintiff "can *never* walk on rough or uneven surfaces" as being "too restrictive" because of "claimant's testimony that she takes her daughter to the park[.]" R. 22 (emphasis added); *see also id.* (rejecting Dr. Carson's finding that plaintiff "can never tolerate exposure to pulmonary

irritants, vibration, or extremes of temperature" because it was "too restrictive and relies too heavily on the claimant's subjective complaints of [shortness of breath]" rather than objective medical evidence of any condition).

Furthermore, the specific reasons the ALJ stated for rejecting these portions of Dr. Carson's opinions are supported by substantial evidence in the record. *See, e.g.*, R. 648–50 (Dr. Carson's own medical report wherein he notes that plaintiff "had no difficulty getting up from sitting or supine position[,]" that "[s]he moved about normally when up" during the examination, that she had "no pitting edema[,]" and that she had normal strength and full range of motion in all her joints); R. 277, 353, 375, 442, 512, 675 (revealing consistently normal pulmonary examinations despite plaintiff's complaints about shortness of breath). The ALJ therefore did not commit error in giving some of Dr. Carson's opinions little or no weight. *See Oldham*, 509 F.3d at 1258 ("The ALJ provided good reasons in his decision for the weight he gave to the treating sources' opinions . . . [n]othing more was required in this case."); *see also* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion."), *id.* § 404.1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").

### B. The ALJ's Leg Elevation Restriction.

Next, plaintiff contends that the ALJ committed error by finding that plaintiff's "job must allow her to elevate her lower extremities up to 18 inches." ECF No. 15 at 8–9. Plaintiff points out that the source of this restriction is the testimony of the vocational expert at plaintiff's hearing, who stated when asked by the ALJ how high a person could elevate his or her legs

during work and "still remain on task" replied that 18 inches would be "okay" but that 24 inches would be an "accommodation." *See* ECF No. 15 at 9 (referencing R. 62–63). Plaintiff argues that this restriction was erroneous because it did not stem from the opinion of the medical professionals whom advised plaintiff at three points over the span of four years that she should keep her legs elevated "above chest level." ECF No. 15 at 9; R. 16, 21. Defendant counters that the ALJ properly found that there was no support for this more extreme limitation in the record, and that it was therefore "not error for the ALJ to give deference to Plaintiff's subjective complaints by including in the RFC finding that she could elevate her legs to 18 inches while working." ECF No. 16 at 11. Defendant has the better argument.

First, the ALJ properly determined that the record did not support the more extreme limitation that plaintiff needed to keep her legs elevated above her chest at work. As the ALJ noted, plaintiff had only been instructed three times over the span of four years to elevate her legs. R. 21. The first time occurred in 2008, which was before plaintiff's alleged onset date. *See* R. 546. During the other two instances, as defendant correctly points out, doctors merely advised plaintiff after she experienced flare-ups of some symptoms that she should elevate her legs, one time even leaving out that it should be "above chest level." R. 319 ("Elevate affected areas above chest level.") (July 29, 2011), 442 ("We explained elevating, alternative heat and ice . . . .") (March 16, 2012). As the ALJ correctly pointed out, they did not state the duration of time plaintiff needed to elevate her legs, or that she needed to do so for an entire workday. *See id.*

Similarly, although Dr. Anderson separately explained in a 2012 medical evaluation that plaintiff had DVTs in her right lower leg with pain and swelling if she "does not elevate her legs

12

frequently[,]" Dr. Anderson did not define what "frequently" meant. *See* R. 21, 375. Finally, the only doctor to render an opinion on plaintiff's functional limitations was Dr. Carson, but even he did not state that plaintiff needed to elevate her legs while at work. *See* R. 642–50. Rather, he opined that plaintiff could "occasionally" operate foot controls with both feet. R. 644. Accordingly, I find substantial evidence supports the finding that plaintiff did not consistently need any restriction regarding elevating her legs throughout the span of a workday.

Finding that the record did not support any restriction, the ALJ nevertheless decided to accommodate plaintiff's subjective complaints about her need to elevate her legs by including in the RFC a minor limitation.[1] R. 21 ("The residual functional capacity takes into account that some elevation is necessary and allows for the claimant to elevate her leg 18 inches while working."). Given my conclusion above that the ALJ properly found plaintiff was *not* entitled to any restriction, her decision to nevertheless include a minor one, regardless of whether that specific limitation is supported by substantial evidence in the record, actually *helped* plaintiff's case for disability. As such, common sense dictates that no error (from plaintiff's perspective, at least) occurred. *See Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166 (10th Cir. 2012) ("In conducting our review, we should, indeed must, exercise common sense.").

---

[1] Part of the ALJ's discussion of whether plaintiff needed to elevate her legs above her heart came in the context of her credibility determination of plaintiff's testimony regarding that fact. *See* R. 21. Finding that substantial evidence supports the ALJ's determination that there was no support in the record for this restriction, I similarly conclude that substantial evidence supports her determination that plaintiff's testimony on this point was not credible. *Diaz v. Sec'y of Health & Human Servs.*, 898 F.2d 774, 777 (10th Cir.1990) ("Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence.").

### C.  SSR 96-8p.

Finally, plaintiff asserts that the ALJ failed to comply with SSR 96-8p, which requires an ALJ to conduct a "function-by-function" assessment during an RFC determination.  *See* SSR 96–8p, 1996 WL 374184, at \*3 ("The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities.").  She appears to contend that the ALJ failed to comply with this rule because the ALJ did not consider each of Dr. Carson's restrictions and limitations in conducting that analysis.  ECF No. 15 at 10.  Simply put, however, that is not correct.[2]  *See* R. 21–25 (assessing separately and in great detail plaintiff's exertional and nonexertional limitations, including those from Dr. Carson's medical source opinion).  Accordingly, I find plaintiff's final argument is unavailing as well.

### ORDER

For the reasons described above, the Court AFFIRMS the Commissioner's decision denying claimant Rachel Barrett's application for Disability Insurance Benefits and Supplemental Security Income.

DATED this 12th day of December, 2016.

BY THE COURT:

_____

R. Brooke Jackson
United States District Judge

---

[2] To the extent plaintiff argues that the ALJ *had* to rely on medical opinions exclusively in crating these limitations, see ECF No. 15 at 10, I point out that no such requirement exists.  SSR 96-8p, 1996 WL 374184, at \*7 n.8 ("A medical source opinion that an individual . . . *has a particular RFC* . . . is an opinion on an issue *reserved to the Commissioner.*  Every such opinion must still be considered in adjudicating a disability claim; however, the adjudicator will *not* give any special significance to the opinion because of its source.") (Emphasis added).